**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **CHARLES MORSE and LESA MORSE** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | |
| ) | **NO. 12-40160-TSH** |
| **COMMONWEALTH OF MASSACHUSETTS** ) | |
| **EXECUTIVE OFFICE OF PUBLIC SAFETY** ) | |
| **DEPARTMENT OF STATE POLICE; STATE** ) | |
| **TROOPER FRECHETTE, K-9 UNIT STATE** ) | |
| **TROOPER MAHER; TOWN OF** ) | |
| **STURBRIDGE; TOWN OF STURBRIDGE** ) | |
| **POLICE DEPARTMENT; POLICE CHIEF** ) | |
| **THOMAS FORD; POLICE SERGEANT** ) | |
| **MICHAEL CLOUTIER; POLICE** ) | |
| **SERGEANT JEFFREY LAVALLE; POLICE** ) | |
| **OFFICER DAVID FORTIER; POLICE** ) | |
| **OFFICER LARRY BATEMAN; POLICE** ) | |
| **OFFICER RONALD OBUCHOWSKI, JR.,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM AND ORDER ON STURBRIDGE DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT (Docket No. 134), STATE TROOPER MAHER'S MOTION**
**FOR SUMMARY JUDGMENT (Docket No. 137), and STATE TROOPER**
**FRECHETTE'S MOTION FOR SUMMARY JUDGMENT (Docket No. 140)**

**August 18, 2015**

**HILLMAN, D.J.**

Plaintiffs Charles and Lesa Morse assert claims against Sturbridge Police Officers

Michael Cloutier, Jeffrey LaVallee, David Fortier, Larry Bateman, Ronald Obuchowski, Jr. (the

"Sturbridge Officers"), and State Troopers Brian Frechette and Sean Maher.[1] Plaintiffs allege

---

[1] Originally named Defendants the Commonwealth of Massachusetts Executive Office of Public Safety
Department of State Police, Town of Sturbridge, Town of Sturbridge Police Department, and Police Chief Thomas
Ford have been dismissed from this action. (Docket Nos. 44 & 62).

1

that Defendants violated their rights against unreasonable searches and seizures secured by the Fourth and Fourteenth Amendments of the U.S. Constitution, and seek damages under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act (Counts V, VI, VII, and VIII). Plaintiffs also assert state tort claims for intentional infliction of emotional distress (Counts IX and X). The Sturbridge Officers, Trooper Maher, and Trooper Frechette have each moved for summary judgment on the claims against them. (Dockets No. 134, 137, and 140, respectively). Because the legal issues raised by each motion substantially overlap, the Court examines them jointly. For the reasons set forth below, the motions are ***denied in part*** and ***granted in part***.

## Factual Background

This case arises from the warrantless arrest of Plaintiff Charles Morse inside his home in Sturbridge, Massachusetts.[2] On August 16, 2009, at 10:58 pm, an individual at 21 River Road in Sturbridge called 911 and stated that people were in his back yard yelling threats and throwing rocks. Sturbridge Police Officers David Fortier and Larry Bateman responded to the call. Upon arrival, two teenage males, Justin Saviengsack and Adrian Podpora, informed the officers that they had been hit by rocks and that "he" was in the woods. One of the teens explained that "he" was their neighbor "Charlie" and that he may have a gun. Officers Fortier and Bateman searched the woods but were unable to find the individual. Sergeant Michael Cloutier, Officer Obuchowski, and Officer LaVallee of the Sturbridge police also arrived on the scene. The Sturbridge Officers requested assistance from Massachusetts State Police K-9 Units.

There is conflicting evidence about what happened between Morse, Saviengsack and Podpora, but the gist of the teenagers' story appears in voluntary written statements made to the

---

[2] For purposes of these summary judgment motions, the facts of this case are recounted from the record in the light most favorable to the non-moving party. *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002). Relevant citations to the summary judgment record are provided in the Court's discussion of each count of the complaint, *infra*.

police on scene. Podpora stated that while he was at Saviengsack's house, someone in the woods began "throwing bottles, rocks, sticks, and metal pieces." The person in the woods was also directing racial slurs at them, and threatened to kill them "one by one with a gun." Podpora stated he believed it was "Charlie Morris [sic] from a couple houses down." Saviengsack reported that as he was standing in his backyard, he heard noises in the woods. When he looked toward the woods, he saw "Charlie Morse who through [sic] a rock an [sic] hit me in my collar bone area." Saviengsack reported that Charlie Morse was yelling racist remarks and that he was going to shoot Saviengsack and Podpora "one by one." He further stated that Morse was "claiming he will take my whole family out when we go to sleep." Officer Bateman knew that Morse had been charged in 2006 for threatening his daughter's ex-boyfriend with a gun, and informed the other officers of this fact.

With the report made from the teenagers in hand, the police began searching for Charles Morse. Around 11:20 pm, Officers Bateman and Obuchowski went down the street to the Morses' house at 28 River Road. Charles's wife Lesa answered the door. Lesa informed the officers that her husband was not home, and that he was out with his friend Christopher Willman. Willman resided at 17 River Road, next door to the Saviengsack's house. Officer Bateman told Lesa that Charles had been in an altercation and asked that she notify him if Charles returned home. Officers Bateman, Obuchowski, and Sergeant Cloutier then went back up the street to the Willmans' house at 17 River Road. Christopher Willman told the officers that he had not seen Charles Morse since 10:30 that evening, they had drank a few beers, and to the best of his knowledge Morse was not carrying a firearm. At this point, K-9 Troopers Frechette and Maher arrived to assist the Sturbridge police in the search for Morse. Just before midnight, Cloutier, Fortier, Bateman, Obuchowski, Frechette and Maher went back to the Morse home, while

Sergeant LaVallee remained at 21 River Road with the complaining witnesses.

While many of the precise details of the evening are unclear from the record, the following facts are undisputed. Upon arriving at the Morse home the second time, Defendants Fortier, Bateman, Obuchowski and Maher went to the back door. Sergeant Cloutier and Trooper Frechette remained at the front of the residence. The officers did not have an arrest warrant. Fortier knocked on the back door. Charles Morse came to the entrance, opened an inner wooden door but left the outer screen door closed. As he opened the wooden door he simultaneously reached to the screen door and locked it. Morse identified himself and asked what was going on. The officers did not explain why they were there, but asked Morse to come outside. Morse refused, and repeatedly asked "what is this about?" The officers could see Morse through the closed screen door. He was wearing shorts but no shirt or shoes; his hands were visible and he was not threatening the officers or making dangerous movements. The officers then informed Morse that he was under arrest and that he needed to come outside. Morse closed the wooden door, and said that he would only surrender if the officers got a warrant. He told his wife to call a lawyer. The officers ordered Morse to open the door, and announced that they would forcibly enter if he did not comply. The outer screen door remained closed and locked for the duration of Morse's conversation with the officers.

When Morse still did not come outside, Officer Obuchowski kicked through the screen door. Obuchowski then kicked a hole in the inner wooden door, enabling entry into the Morse home. The only officers that entered the home were Cloutier, Fortier, Bateman, Obuchowski, and Maher. Officer LaVallee and Trooper Frechette did not enter the residence or participate in the forced entry. Once inside, Fortier and Maher took custody of Morse by forcing him to the ground and pointing guns at his head as they applied handcuffs.

4

As the police took custody of Charles, Lesa Morse began yelling. Alison Willman—Christopher Willman's wife—called on the phone to ask what was going on; Lesa answered and began telling her that the police had Charles on the floor with guns pointed at his head. Sergeant Cloutier ordered Lesa to hang up the phone, but Lesa refused. Sergeant Cloutier grabbed Lesa by the arm and threw her face first onto the couch, forced her hands behind her back and cuffed her. Lesa Morse remained in handcuffs for five or six minutes while the officers conducted a protective sweep of the residence. The officers removed Charles Morse and transported him to 21 River Road, where Saviengsack and Podpora identified Morse as the individual who threw rocks and threatened them. Morse was charged with two counts of assault and battery with a dangerous weapon (rocks), threat to commit a crime (murder), disorderly conduct, and disturbing the peace. The charges were later dismissed.

Plaintiffs filed this action in Massachusetts Superior Court. It was removed to this Court on December 4, 2012. (Docket No. 1). Plaintiffs allege that they have experienced physical and emotional harm as a result of Defendants' conduct. The complaint asserts the following claims against Defendants: civil rights violations under 42 U.S.C. § 1983 against State Troopers Frechette and Maher (Count V); civil rights violations under the Massachusetts Civil Rights Act ("MCRA") against State Troopers Frechette and Maher (Count VI); civil rights violations under 42 U.S.C. § 1983 against the Sturbridge Officers (Count VII); civil rights violations the MCRA against the Sturbridge Officers (Count VIII); intentional infliction of emotional distress against State Troopers Frechette and Maher (Count IX); and intentional infliction of emotional distress against the Sturbridge Officers (Count X). Defendants have moved for summary judgment on all claims. (Docket Nos. 134, 137 and 140).

## Discussion

### Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that a district court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1968). It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. U.S.*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *See Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex*, 477 U.S. at 325). When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002).

*§ 1983 Claims: Counts V & VII*

Counts V and VII assert claims against the Sturbridge Officers, Trooper Maher and Trooper Frechette in their individual capacities under 42 U.S.C. § 1983, for violations of Plaintiffs' Fourth Amendment rights to be free from unreasonable searches and seizures. Plaintiffs argue that Defendants violated their Fourth Amendment rights under two distinct theories: (1) Defendants' warrantless entry into the Morse home and arrest of Charles Morse was unreasonable; and (2) Defendants' use of force to effect the arrest was excessive. Defendants contend that no Fourth Amendment violations occurred; alternatively, Defendants argue that they are entitled to qualified immunity.

*(1) Warrantless Entry and Arrest*

Plaintiffs' primary contention is that Defendants violated their Fourth Amendment rights by entering their home and arresting Charles Morse without a warrant.

Whether the record supports a Fourth Amendment violation based on warrantless entry

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend IV. At the "very core" of this guarantee is the right of an individual to be free from unreasonable governmental intrusion in his own home. *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013); *see also Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S. Ct. 2091 (1984) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."); *Georgia v. Randoloph*, 547 U.S. 103, 1523, 126 S. Ct. 1515 (2006) ("We have . . . lived our whole national history with an understanding of 'the ancient adage that a man's house is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown." ) (quoting *Miller v. United States*, 357 U.S. 301, 307, 78 S. Ct. 1190 (1958)).

7

It is black-letter law that "seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943 (2006). However, because "the ultimate touchstone of the Fourth Amendment is reasonableness," the Supreme Court has recognized that the warrant requirement is subject to certain reasonable exceptions. *Kentucky v. King*, --- U.S. ---, 131 S. Ct. 1849, 1856 (2011) (internal quotations omitted). One exception is when exigent circumstances "make the needs of law enforcement so compelling that the warrantless search [or seizure] is objectively reasonable." *Mincey v. Arizona*, 437 U.S. 386, 394, 98 S. Ct. 2408 (1978). To overcome the presumption of unreasonableness in the context of a warrantless entry into a home, the entry must be supported by both probable cause and exigent circumstances. *See Welsh*, 466 U.S. at 741-42 (citing *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371 (1980)). Otherwise, "warrantless arrests in the home are prohibited by the Fourth Amendment." *Id.*

There is no material fact dispute regarding probable cause. Saviengsack and Podpora both reported to the police that Charles Morse threw rocks at them and threatened to kill them with a gun. *See* Voluntary Witness Statements, Docket Nos. 136-4 & 136-5. This information was sufficiently reliable to support a finding of probable cause. *See Holder v. Town of Sandown*, 585 F.3d 500, 504-05 (1st Cir. 2009). Notwithstanding the existence of probable cause, there is substantial evidence in the summary judgment record to support Plaintiffs' contention that there was no exigency. "Exigent circumstances exist where law enforcement officers confront a compelling necessity for immediate action that would not brook the delay of obtaining a warrant." *See United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995) (internal quotations and alterations omitted). The First Circuit has identified a number of exigent circumstances that may justify a warrantless search or seizure, including (1) hot pursuit of a fleeing felon; (2) threatened

destruction of evidence inside the residence before a warrant can be obtained; (3) a risk that the suspect may escape from the house; or (4) a threat posed to officers, the suspect, or others inside the home. *Id.* Whether an exigency exists is "invariably . . . fact-intensive," but the "inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." *Id.*

In this case, a reasonable juror could conclude that, based on the objective facts known to Defendants, no exigency existed to justify the warrantless entry and arrest. When the officers went to the Morse home for the second time, a full hour had passed since the altercation. *See* Obuchowski Narrative Report, Docket No. 136-6 (describing timeline of search for Morse). As Bateman, Fortier, Obuchowski and Maher approached the back door, Sergeant Cloutier and Trooper Frechette covered the front door, and the complaining witnesses were safely back at 21 River Road with Sergeant LaVallee. *See id.*; Obuchowski Dep., Docket No. 137-13, at 43:12-15; LaVallee Dep., Docket No. 152-18, at 52:4-53:6. Officer Fortier testified at his deposition that, based on his understanding of the circumstances, there was no emergency or exigent circumstance as he went to knock on the door. *See* Fortier Dep., Docket No. 152-11, at 63:15-21. Fortier further testified that he asked Morse to come outside in order to speak with him, and at that point no decision to arrest had been made. *See* Fortier Dep., Docket No. 152-11, at 56:1-24. Fortier also acknowledged that they were not in "hot and continued pursuit" of Morse. *See* Fortier Dep., Docket No. 152-11, at 50:14-16. Although the officers had been looking for Morse, the officers had not chased him into his home.[3] *See* Charles Morse Dep., Docket No. 152-8, at

---

[3] Some evidence suggests that the officers understood they were actively pursuing a dangerous suspect who was in flight. *See, e.g.*, Maher Dep., Docket No. 137-3, at 50:5-18 (describing that officers had set up a "perimeter to contain an individual who had fled into the woods" and that there was an active K9 track to locate Morse). However, a reasonable juror could conclude that the officers did not have an objective basis to believe that Morse was fleeing, as opposed to walking home unaware of the police presence. There is no evidence that the officers saw Morse running away; and the testimony of Fortier and Morse supports the inference that Morse was not in flight. Furthermore, the mere fact that a K9 officer was able to track Morse's scent to his home does not require the

96:2-97:15, 101:9-103:16 (Morse describing how he walked home from the Willmans' house and was unaware of police search until he arrived home and spoke to his wife). Officer Bateman testified that once Morse came to the door, he could see Morse well, his hands were visible, and he was not making threats. *See* Bateman Dep., Docket No. 137-6, at 121:14-122:8. This assessment was corroborated by Fortier, who stated that Morse was not making dangerous movements or presenting any threat as the officers spoke to him at the door. *See* Fortier Dep., Docket No. 152-11, at 52:6-9, 57:1-3. It is undisputed that Morse remained inside his home, behind a locked screen door, for his entire conversation with the officers. *See, e.g.*, Fortier Dep., Docket No. 152-11, at 60:12-66:20.

Although the criminal offenses for which Morse was suspected were serious, "no exigency is created simply because there is probable cause to believe that a serious crime has been committed." *Welsh*, 466 U.S. at 753. None of the officers contend that they feared Morse would flee out the back door, destroy evidence, or harm anyone inside the home.[4] Officer Obuchowski, who kicked in the door, testified that he did so not because of immediate danger, but because Morse was not cooperating. *See* Obuchowski Dep., Docket No. 152-12, at 54:10-20, 55:15-56:22. The deposition testimony of Charles and Lesa Morse supports the conclusion that there was no exigency, and that Morse merely sought to protect his constitutional rights before

conclusion that Morse was attempting to evade the police. For purposes of these summary judgment motions, the Court draws all reasonable inferences in Plaintiffs' favor. *See Scanlon*, 277 F.3d at 600.

[4] In an additional effort to underscore the exigent nature of the encounter, Defendants emphasize that Morse owned six firearms. It is true that the officers had been told that Morse made a threat to kill with a gun; but it is not clear from the record whether all the officers who approached the Morse home were aware at the time that Morse kept firearms in his home. Obuchowski, the officer who kicked in the door, testified that he did not have any evidence that Morse had weapons on him as they went to the door. *See* Obuchowski Dep., Docket No. 152-12, at 51:24-52:4. Moreover, there is no evidence to suggest that Morse was attempting to access his firearms while the police were outside his door. As described above, the notion that Morse posed a threat to the officers is directly contradicted by the testimony of Fortier and Bateman. *See* Bateman Dep., Docket No. 137-6, at 121:14-122:8; Fortier Dep., Docket No. 152-11, at 52:6-9, 57:1-3. Thus, viewing the record in the light most favorable to Plaintiffs, the mere fact that Charles Morse was a gun owner does not inform this Court's exigency analysis.

surrendering. *See* Charles Morse Dep., Docket No. 137-12, at 107:1-119:7 (describing confusion at why the police wanted to speak with him); Lesa Morse Dep., Docket No. 152-9, at 75:10-76:6 (same). A reasonable juror could credit this evidence and find that there was no objective basis for the officers to believe that exigent circumstances existed. Therefore, viewing the record in the light most favorable to Plaintiffs, genuine factual disputes exist that are material to the question of whether the warrantless entry and arrest violated Plaintiffs' Fourth Amendment rights.

However, the Court finds no evidence in the record to establish that Sergeant LaVallee or Trooper Frechette participated in the warrantless entry and arrest, and Plaintiffs do not dispute this point. *See* Pls.' Resp. to Sturbridge Defs.' Statement of Facts, Docket No. 152-24, at ¶ 72. Consequently, summary judgment will enter on Counts V and VII as they apply to Defendants LaVallee and Frechette.

<u>Whether qualified immunity applies to the warrantless entry claim</u>

Defendants contend that, even if the record supports a finding of a constitutional violation based on the warrantless entry and arrest, they are entitled to qualified immunity. Qualified immunity protects police "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). The doctrine provides public officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. Al-Kidd*, --- U.S. ---, 131 S. Ct. 2074, 2085 (2011). However, "qualified immunity does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful." *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (internal quotations omitted). Courts use a two-part test to determine whether qualified immunity applies: (1) whether the facts alleged by the plaintiff make out a violation of a

constitutional right; and, if so (2) whether the right was clearly established at the time of the alleged violation. *See MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014).

As described above, the record contains sufficient evidence to establish that Plaintiffs' Fourth Amendment rights were violated by the warrantless entry. Therefore, to overcome Defendants' qualified immunity defense, Plaintiffs must show that their rights were "clearly established" at the time of the violation. This analysis involves two questions: first, whether the legal contours of the constitutional right were sufficiently clear; and second, whether in the specific factual context of the case, the violation would have been clear to a reasonable official. *Id.* at 12. "The salient question is whether the state of the law at the time gave a defendant 'clear notice that what he was doing was unconstitutional.'" *Diaz-Bigio v. Santini*, 652 F.3d 45, 50 (1st Cir. 2011). With this framework in place, the Court turns to the present dispute.

In 1980, the Supreme Court made clear that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York* 445 U.S. 573, 590, 100 S. Ct. 1371 (1980). The Court observed that in no setting is the zone of Fourth Amendment protection "more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.'" *Payton*, 445 U.S. at 589-90. Notwithstanding this straightforward rule, Defendants contend that they are entitled to qualified immunity because the Constitution's application to the facts of this case was unclear at the time of Morse's arrest. Defendants rely on *Joyce v. Town of Tewksbury*, in which an en banc panel of the First Circuit found officers entitled to qualified immunity following a warrantless arrest. 112 F.3d 19 (1st Cir. 1997) (en banc).

In *Joyce*, officers arrested Lance Joyce on a charge of violating a domestic restraining order. *Id.* at 20. Seeking to effect the arrest, the officers went to the home of Joyce's parents. *Id.* Joyce, who did not live there, came to the door. *Id.* Although the officers had an arrest warrant, they did not have a search warrant that would permit them to enter the third-party home of the parents. *Id.* at 21. When Joyce answered, he opened the interior door but kept the outer screen door closed. *Id.* at 20. The officers informed Joyce that they had a warrant for his arrest, and asked him to step outside. *Id.* Joyce retorted "ya right," withdrew from the doorway, and called for his mother. *Id.* The police followed Joyce into the house and arrested him. *Id.* The First Circuit did not reach the merits of the Fourth Amendment question, but found that even if a constitutional violation occurred, the officers were entitled to qualified immunity. *Id.* at 23. In reaching this conclusion, the court observed that the facts of the case implicated both the doctrines of hot pursuit and arrests of suspects in third-party homes, but that Supreme Court precedents on the subjects did not definitively resolve the case. *Id.* at 22. The court further noted that lower court cases revealed that "there is no settled answer as to the constitutionality of doorway arrests." *Id*. Because of the "unsettled state of the law" as it applied to Joyce's arrest, the First Circuit concluded that the officers were protected by qualified immunity.

Defendants argue that *Joyce* controls the outcome of this case. The Court disagrees.[5]  In *Joyce*, several factors combined to suggest that the arrest was at least arguably reasonable,

---

[5] The Court notes that in *Joyce*, the First Circuit expressly did not reach the merits of the constitutional question. *See Joyce*, 112 F.3d at 23 (stating that the question of whether a Fourth Amendment violation occurred is "a point we do not decide"). As a result, the facts of *Joyce* itself are of little or no relevance in informing officers of when a warrantless entry is reasonable under the Fourth Amendment. *See Johnson v. Jones*, 515 U.S. 304, 312, 115 S. Ct. 2151 (1995) (observing that "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806 (1985)). Therefore, the Court rejects Defendants' contention that a reasonable officer who reads *Joyce* would believe that the arrest of Charles Morse was constitutional. The court decided only that the officers were shielded by immunity, not that their conduct comported with the Fourth Amendment. For the reasons described herein, the circumstances faced by the officers in *Joyce* were materially distinct for purposes of the qualified immunity analysis.

thereby clouding the constitutional question faced by the officers. First, Lance Joyce was not inside in his own home, but that of a third party. Therefore, Joyce had no Fourth Amendment rights in the location of his arrest. *See Steagald v. United States*, 451 U.S. 204, 218-19, 101 S. Ct. 1642 (1981) (observing that Fourth Amendment rights "are personal in nature, and cannot bestow vicarious protection" on those in the home of a third party). Instead, it was Joyce's parents' Fourth Amendment rights at issue.[6] Second, despite the fact that the officers did not have the required search warrant, they did have an arrest warrant. Thus, Joyce's arrest had already been vetted and approved by a neutral magistrate. Third, by obtaining a warrant and approaching the third party home, the officers were actively pursuing the suspect *for the purpose* of making an arrest. This aspect of the case resembled the arrest in *United States v. Santana*, where the Supreme Court found that a pursuit may justify a warrantless entry when a suspect retreats from a public place into a residence. 427 U.S. 38, 96 S. Ct. 2406 (1976). Finally, the officers merely "followed" Joyce into the dining room after he turned away from the door; there is no indication that they forcibly entered the home. *See Joyce*, 112 F.3d at 20-21.

These factors are not present here. Morse was in his own home, where his personal Fourth Amendment rights were indisputably at their "zenith." *See United States v. Martins*, 413 F.3d 139, 146 (1st Cir. 2005) (citing *Kyllo v. United States*, 533 U.S. 27, 31, 121 S. Ct. 2038 (2001)). No neutral magistrate approved Morse's arrest, as Defendants had not obtained a warrant of any kind. Unlike in *Joyce*, the arrest of Charles Morse was not already in progress; Officer Fortier testified that no decision had been made to arrest Morse as the officers

---

[6] "The issue [in cases of arrests in third-party homes] is not whether the subject of an arrest warrant can object to the absence of a search warrant when he is apprehended in another person's home, but rather whether the resident of that home can complain of the search." *Steagald*, 451 U.S. at 219. The fact that Joyce was in his parents home implicated a different strand of Fourth Amendment doctrine not at issue here—that "even if armed with an arrest warrant, police must generally have a search warrant to enter lawfully a third person's home." *Joyce*, 112 F.3d at 21-22 (citing *Steagald*, 451 U.S. at 212-13).

approached the door.[7] *See* Fortier Dep., Docket No. 152-11, at 56:1-24. The *Joyce* court

acknowledged that this circumstance would change the analysis, stating that "entry where an

arrest is not already in progress . . . would present quite a different case." *Joyce*, 112 F.3d at 22.

Further, the manner in which Defendants were required to effect the arrest—kicking in two

closed and locked doors after Morse asserted his own constitutional rights—was far more

intrusive than the warrantless entry in *Joyce*, where the police merely followed the suspect into

the dining room of a third-party home. *See id.* at 22 (noting that the ultimate touchstone of

Fourth Amendment law is reasonableness). Viewed in this context, the officers in this case were

presented with a far clearer picture of what was constitutionally permissible than those who

arrested Lance Joyce.

The Court further rejects Defendants' contention, also derived from *Joyce*, that they are

entitled to qualified immunity because this was a constitutionally ambiguous "doorway arrest." It

is true that some courts have concluded that warrantless "doorway arrests" or "threshold arrests"

may be constitutional under some circumstances. However, those cases relate to instances where

a suspect was apprehended at the threshold of the residence with an *open* door. *See, e.g.*, *State v.*

*Morse*, 125 N.H. 403, 407, 480 A.2d 183 (1984) (collecting cases and noting that courts

upholding "doorway arrests" have "stress[ed] that the arrest in each case was effected *without the*

---

[7] Defendants argue that the arrest became "in progress" and a "hot pursuit" began when the police announced that Morse was under arrest and threatened to enter the home, but Morse did not surrender. However, it was well-established in 2009 that circumstances deliberately created by the police cannot give rise to an exigency that justifies a warrantless entry. *See United States v. Curzi*, 867 F.2d 36, 43 n.6 (1st Cir. 1989); *see also United States v. Rengifo*, 858 F.2d 800, 804 (1st Cir. 1988) (recognizing that "'exigent circumstances' do not excuse the failure to secure a warrant when those circumstances are created by government officials who unreasonably and deliberately delay or avoid obtaining the warrant"), *abrogated by Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011) (upholding lower courts' recognition of the police-created exigency doctrine, and holding that the police may not create an exigent circumstance "by means of an actual or threatened violation of the Fourth Amendment"). Defendants' argument that an exigency arose because Morse did not exit his house once told he was under arrest— in other words, because he chose "to stand on his constitutional right[]" to be free from unreasonable seizures—is untenable. *See Kentucky v. King*, 131 S. Ct. at 1862.

*police having to enter the defendant's residence*" (emphasis added)); *United States v. Rengifo*, 858 F.2d 800, 804-05 (1st Cir. 1988) (finding exigent circumstances to justify warrantless entry where suspects opened door to flee motel room, but noting that "we might be more critical of this approach in the context of a private dwelling"); *United States v. Carrion*, 809 F.2d 1120, 1123, 1128 & n.9 (5th Cir. 1987) (finding suspect had no reasonable expectation of privacy "at the open door to his hotel room"). Similarly, the cases cited by Defendants in which district courts have invoked the "unsettled" law of doorway arrests to apply qualified immunity involved suspects with open doors and did not involve forced entries by the police. *See Abrami v. Town of Amherst*, CV No. 09-30176-DPW, 2013 WL 3777070, *1-2, *8-9 (D. Mass. Jul. 16, 2013); *Holder v. Town of Newton*, CV No. 08-cv-197-JL, 2010 WL 432357, *2 (D. N.H. Feb. 3, 2010).

The observation in *Joyce* that the law of doorway arrests is unsettled is true as far as it goes, but the arrest of Charles Morse was simply not a doorway arrest. Morse never opened his door to the officers, nor did he retreat back into his home after his arrest began. To the contrary, Morse was fully inside his home for the entire encounter, with a closed and locked screen door, posing no threat of escape or danger to Defendants. In other words, Morse's entire person was purposefully and unequivocally behind the "firm line" drawn by the Fourth Amendment at the entrance to the home. *Payton*, 445 U.S. at 590. Because Morse chose not to leave this constitutionally protected area, the officers broke into his home by kicking through two closed and locked doors, arrested him at gunpoint and handcuffed his wife in her living room.

Thus, the right at issue in this case is properly defined as the right to be free from seizures when *inside* one's own home by government officials who have neither a warrant nor exigent circumstances. Without a doubt, this right was clearly established at the time of Charles Morse's arrest. *See Tower v. Leslie-Brown*, 326 F.3d 290, 296 (1st Cir. 2003) ("Certainly, the

unlawfulness of entering a person's home to effectuate a warrantless arrest in the absence of exigent circumstances was clearly established . . . [as of] 2001." (citing *Payton*, 445 U.S. at 590)). Viewing the facts from the record in the light most favorable to the Plaintiffs, no reasonable law enforcement officer would have understood the warrantless entry and arrest of Charles Morse to comport with the Fourth Amendment. Accordingly, the Court finds that the law enforcement officials who effected the warrantless entry and arrest—Defendants Cloutier, Fortier, Bateman, Obuchowski and Maher—are not entitled to qualified immunity.

*(2) Excessive Force*

Plaintiffs next allege that, after the officers entered their home, a second, independent Fourth Amendment violation occurred because Defendants used excessive force to take custody of Plaintiffs. Specifically, Plaintiffs claim that Defendants used unreasonable force by seizing Charles Morse at gunpoint and detaining Lesa Morse with handcuffs.[8] The Fourth Amendment's protection against unreasonable seizures prohibits officers from "exceed[ing] the bounds of reasonable force in effecting an arrest or investigatory stop." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010) (*citing Graham v. Connor*, 490 U.S. 386, 394-95, 109 S. Ct. 1865 (1989)). To demonstrate a violation based on excessive force, "a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances." *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007). To determine whether force was unreasonable, courts "balance the individual's interest against the government's weighing three non-exclusive factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of

---

[8] Because Plaintiffs allege that this conduct constituted a Fourth Amendment violation independent from the warrantless entry, the Court only considers Defendants' use of guns and handcuffs for purposes of the excessive force claim.

the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Raiche*, 623 F.3d at 36 (internal quotations and alterations omitted).

A reasonable juror could conclude that seizing Charles Morse at gunpoint and detaining Lesa Morse with handcuffs was unreasonable under the circumstances.[9] Nonetheless, the Court finds that the officers are entitled to qualified immunity on the excessive force claim because Plaintiffs' rights, in the context of this specific case, were not clearly established. "The relevant question is not whether the Fourth Amendment generally prohibited excessive force." *Hunt v. Massi*, 773 F.3d 361, 368 (1st Cir. 2014). Instead, the question is whether the Fourth Amendment prohibited the specific use of force that the officers employed *on Charles and Lesa Morse*. *Id.* (stating that whether the law is clearly established must be analyzed "in light of the specific context of the case, not as a broad general proposition").

Thus, the Court must define the specific right at issue. *See al-Kidd*, 131 S. Ct. at 2084 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). Charles Morse's asserted right is the right to not be handcuffed at gunpoint while under arrest for serious crimes. Lesa Morse's asserted right is the right of an innocent bystander to not be handcuffed while officers effect the arrest of another individual in the residence. Yet Plaintiffs cite no cases that would have given Defendants clear notice that the specific type of force used against each Plaintiff was unconstitutional, and the Court is aware of none. To the

---

[9] The crimes for which Morse was suspected—including assault with a dangerous weapon and threats to kill with a gun—were certainly severe. As described above, though, there is significant evidence in the record that the Morses did not pose any threat to the safety of the officers or others in the home. *See, e.g.*, Bateman Dep., Docket No. 137-6, at 121:14-122:8; Lesa Morse Dep., Docket No. 137-11, at 49:3-9 (Lesa Morse describing how she began backing up once the officers entered). Further, viewed in the light most favorable to Plaintiffs, the record supports the conclusion that neither Charles Morse nor Lesa Morse were resisting arrest. *See, e.g.*, Charles Morse Dep., Docket No. 137-12, at 163:11-19 (Charles Morse stating that he complied with officers' command to get on the ground once they entered the house); Lesa Morse Dep., Docket No. 152-11, at 199:1-200:23 (Lesa Morse describing how she was thrown to the couch and handcuffed). Thus, upon weighing the interests of the government and individuals in light of the excessive force factors, a reasonable factfinder could conclude that the use of force in this case exceeded the bounds of the Fourth Amendment.

contrary, case law suggests that aiming guns at Morse during his arrest at least arguably fell within the realm of reasonableness. *See Henry v. Storey*, 658 F.3d 1235, 1240-41 (10th Cir. 2011) (finding that, without more, aiming weapons at adult suspected of serious crime during arrest did not constitute excessive force); *Fulton v. Robinson*, 289 F.3d 188, 194 (2d Cir. 2002) (affirming dismissal of excessive force claim where Plaintiff was arrested at gunpoint because officers knew that suspect was wanted on a charge of making a threat with a gun).

Lesa Morse was handcuffed by Sergeant Cloutier due to concerns about officer safety after she began yelling and did not obey commands to hang up the phone. *See* Bateman Narrative Report, Docket No. 136-3, at 2. Again, cases suggest that such a use of force was at least arguably reasonable. *See Ingram v. City of Columbus*, 185 F.3d 579, 591-92 (6th Cir. 1999) (observing that officers may detain innocent occupants with handcuffs during arrest of criminal suspect in a home where the officers feared for their personal safety); *cf. Los Angeles County, California v. Rettele*, 550 U.S. 609, 614, 127 S. Ct. 1989 (2007) ("[O]fficers may take reasonable action to secure the premises and to ensure their own safety" while executing a search warrant, including holding innocent occupants at gunpoint); *Michigan v. Summers*, 452 U.S. 692, 705, 101 S. Ct. 2587 (1981) (holding that it is permissible under the Fourth Amendment to detain occupants of a residence while executing a search warrant of the residence).

Accordingly, the Court must apply qualified immunity on Plaintiffs' excessive force claim. *See al-Kidd*, 131 S. Ct. at 2083 (stating that, in order for a right to be clearly established on a § 1983 claim, "existing precedent must have placed the . . . constitutional question beyond debate"). The Court underscores that this finding applies only to the use of force employed by Defendants *after* they entered the home, which Plaintiffs assert gives rise to a constitutional violation independent from the warrantless entry and arrest. For the reasons stated above,

Plaintiffs' claims of a Fourth Amendment violation will survive summary judgment based on the warrantless entry and arrest.

In sum, because there is no evidence that Trooper Frechette or Officer LaVallee participated in the warrantless entry and arrest of Plaintiffs, the Court will grant summary judgment on Counts V and VII as they pertain to Defendants Frechette and LaVallee. However, genuine issues of material fact exist regarding Plaintiffs' warrantless entry claim, and Defendants Cloutier, Fortier, Bateman, Obuchowski and Maher are not entitled to qualified immunity for the warrantless entry and arrest. Therefore, the Court will deny the motions for summary judgment on Counts V and VII as they pertain to Defendants Cloutier, Fortier, Bateman, Obuchowski and Maher. Because Defendants Cloutier, Fortier, Bateman, Obuchowski and Maher are entitled to qualified immunity on the excessive force claim, Counts V and VII survive summary judgment only on the warrantless entry and arrest theory.

### *Massachusetts Civil Rights Act Claims: Counts VI & VIII*

Plaintiffs assert additional civil rights claims against Defendants under the Massachusetts Civil Rights Act ("MCRA"). The MCRA claims are also based on the conduct of Defendants in effecting the warrantless entry and arrest of Charles Morse. The MCRA is the state analog to § 1983, and provides a cause of action for individuals whose rights under the constitution or laws of the United States or Commonwealth of Massachusetts have been interfered with by "threats, intimidation, or coercion." M.G.L. c. 12, §§ 11H & I; *see also Raiche*, 623 F.3d at 40. Although the MCRA is largely coextensive with its federal counterpart, the "threats, intimidation, or coercion" requirement creates an important distinction. The Supreme Judicial Court of Massachusetts has ruled that "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]." *Longval v. Comm'r*

*of Corr. et al.*, 404 Mass. 325, 333, 535 N.E.2d 588 (1989); *see also Planned Parenthood League of Mass. v. Blake*, 417 Mass. 467, 473, 631 N.E.2d 467 (1994) (observing that, to be actionable under the MCRA, a direct violation of a person's rights must "also include[] threats against, or intimidation or coercion of, a particular individual" in interference with that person's exercise of rights secured by law). Consequently, courts have concluded that "the constitutional violation itself cannot also serve as the prerequisite 'threats, intimidation, or coercion' under the MCRA." *Santiago v. Keyes*, 890 F. Supp. 149, 155 (D. Mass. 2012).

Evidentiary support exists for this additional element of Plaintiffs' MCRA claims. Several armed police officers gathered outside the door of the Morse home at night. *See* Obuchowski Narrative Report, Docket No. 136-6, at 2. When Morse refused to come outside to speak with the officers, they demanded that he exit and be placed under arrest. *See, e.g.*, Maher Dep., Docket No. 152-7, at 67:2-8. Morse responded by telling the officers to get a warrant, closing the interior door, and asking his wife to call a lawyer. *See* Charles Morse Dep., Docket No. 152-8, at 115:1-116:3. In response, the officers announced that if Morse did not exit his home and surrender to arrest, they would forcibly enter. *See* Obuchowski Narrative Report, Docket No. 136-6, at 2. Viewed in the light most favorable to Plaintiffs, this conduct plainly amounts to the use of threats, intimidation, or coercion to convince Morse to give up his constitutional right to be free from unreasonable seizures inside the home. Thus, Defendants' conduct involved "more than a simple, direct action in denial of the [Morses'] rights." *Planned Parenthood League of Mass.*, 417 Mass. at 473. Because Plaintiffs have offered sufficient evidence to establish the liability of Defendants Cloutier, Fortier, Bateman, Obuchowski and Maher under the MCRA, summary judgment is precluded.[10]

---

[10] For the same reasons as stated above, the officers are entitled to qualified immunity on the question of excessive force, but not the warrantless entry. *See Raiche*, 623 F.3d at 40 (noting that the SJC "has held that MCRA

Because there is no evidence that Defendants LaVallee or Frechette entered the Morse home or otherwise participated in the warrantless entry and arrest, summary judgment will enter on Counts VI and VIII as they pertain to LaVallee and Frechette.

### *Intentional Infliction of Emotional Distress Claims: IX & X*

Counts IX and X of Plaintiffs' complaint allege that Defendants' conduct is actionable for intentional infliction of emotional distress. To prevail on a claim for intentional infliction of emotional distress in Massachusetts, a plaintiff must show: (1) the defendants either intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of the conduct; (2) the conduct was extreme and outrageous; (3) the conduct caused the plaintiff emotional distress; (4) the emotional distress was severe and of a nature that no reasonable person could be expected to endure it. *See Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45, 355 N.E.2d 315 (1976). Conduct is "extreme and outrageous" only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Foley v. Polaroid Corp.*, 400 Mass. 82, 99, 508 N.E.2d 72 (1987). The standard requires "more than workaday insults, annoyances, or even threats and petty oppressions." *Conway v. Smerling*, 37 Mass. App. Ct. 1, 8, 635 N.E.2d 268 (1994). Instead, the tort requires "a high order of reckless ruthlessness or deliberate malevolence that . . . is simply intolerable." *Id.* "Where police officers merely carry out their obligations as law enforcement officials, their conduct as a matter of law cannot be deemed extreme and outrageous." *Robinson v. Cook*, 863 F. Supp. 2d 49, 73 (D. Mass. 2012) (citing *Sena v. Commonwealth*, 417 Mass. 250, 264 (1994)) (internal quotations and alterations omitted).

---

claims are subject to the same standard of immunity for officers that is used for claims under § 1983). Therefore, Counts VI and VIII will survive summary judgment based only on the warrantless entry and arrest theory.

Plaintiffs' intentional infliction claims are based on the same conduct as the federal and state civil rights claims. A reasonable juror could find that Defendants Cloutier, Fortier, Bateman, Obuchowski and Maher knew or should have known that emotional distress was a likely result of breaking in to the Morse home without a warrant, arresting Charles Morse at gunpoint and handcuffing Lesa Morse in her living room. Whether this conduct was "extreme and outrageous" is also fit for the jury. Viewed in the light most favorable to Plaintiff, this is not a case where the police merely effected a constitutional arrest pursuant to their normal law enforcement duties. Especially in light of our nation's longstanding commitment to protecting the sanctity of the home from unreasonable governmental intrusion, a factfinder could reasonably conclude that Defendants' conduct was atrocious and utterly intolerable. *See Poy v. Boutselis*, 352 F.3d 479, 485 (1st Cir. 2003) (finding that question of whether police officer's conduct in violating plaintiff's Fourth Amendment rights was extreme and outrageous was a factual issue for a jury). Plaintiffs have also offered deposition testimony and substantial medical records that document the severe emotional distress they claim to have suffered as a result of Defendants' conduct. *See, e.g.*, Harrington Hospital Records, Docket No. 152, Ex. 23; Lesa Morse Dep., Docket No. 152, Ex. 9, at 115-128. Consequently, genuine issues of material fact exist that preclude summary judgment on Counts IX and X as they apply to Defendants Cloutier, Fortier, Bateman, Obuchowski and Maher.

Because there is no evidence that Defendants LaVallee or Frechette entered the Morse home or otherwise participated in the warrantless entry and arrest, summary judgment will enter on Counts IX and X as they pertain to LaVallee and Frechette.

**<u>Conclusion</u>**

For the foregoing reasons, the Court rules as follows:

(1) The Motion for Summary Judgment by State Trooper Frechette (Doc. 140) is ***<u>granted</u>***. All claims against Trooper Frechette are dismissed and he is terminated as a party in the case.

(2) The Motion for Summary Judgment by State Trooper Maher (Doc. 137) is ***<u>denied</u>***.

(3) The Motion for Summary Judgment by the Sturbridge Officers (Doc. 134) is ***<u>granted</u>*** as it pertains to Sergeant LaVallee only. All claims against Sergeant LaVallee are dismissed and he is terminated as a party in the case. The motion is ***<u>denied</u>*** as it pertains to Defendants Cloutier, Fortier, Bateman, and Obuchowski.

Therefore, Counts V, VI, VII, VIII, IX and X survive summary judgment as against Defendants Cloutier, Fortier, Bateman, Obuchowski and Maher.

SO ORDERED.

> *<u>/s/ Timothy S. Hillman</u>*
> **TIMOTHY S. HILLMAN**
> **DISTRICT JUDGE**