# United States Court of Appeals
## For the First Circuit

No. 15-2043

CHARLES MORSE and LESA MORSE,

Plaintiffs, Appellees,

v.

MICHAEL CLOUTIER ET AL.,

Defendants, Appellants.

No. 15-2053

CHARLES MORSE and LESA MORSE,

Plaintiffs, Appellees,

v.

SEAN P. MAHER,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Thompson, Selya and Barron,
Circuit Judges.

Case 4:12-cv-40160-TSH   Document 175   Filed 08/25/17   Page 2 of 31

    Thomas R. Donohue, with whom Leonard H. Kesten, Deidre Brennan Regan, and Brody, Hardoon, Perkins & Kesten, LLP were on brief, for appellants Cloutier et al.

    Joseph G. Donnellan, with whom Rogal & Donnellan, P.C. was on brief, for appellant Maher.

    James B. Triplett, with whom Triplett & Fleming was on brief, for appellees.

————————————

August 25, 2017

————————————

      **SELYA**, <u>**Circuit Judge**</u>.  The Supreme Court has recognized that "a man's house is his castle" and has interpreted the Fourth Amendment to safeguard private homes against most warrantless intrusions.  <u>Payton</u> v. <u>New York</u>, 445 U.S. 573, 589-90, 596 (1980).  But there are some exceptions to this rule — and in this case, the defendants (police officers acting as such) assert that exceptions for exigent circumstances and/or doorway arrests afford them at least arguable shelter.  The district court disagreed, denying their motions for summary judgment.  <u>See</u> <u>Morse</u> v. <u>Mass. Exec.</u> <u>Office of Pub. Safety Dep't of State Police</u>, 123 F. Supp. 3d 179, 196 (D. Mass. 2015).  After careful consideration, we conclude that, on the plaintiffs' supported version of the facts, the defendants' conduct violated clearly established law.  <u>See</u> <u>id.</u> at 192.  Cognizant, as we are, that this decision rests largely on what the district court reasonably perceived to be questions of fact, we dismiss substantial portions of these interlocutory appeals for want of appellate jurisdiction and otherwise affirm.

**I.  BACKGROUND**

      Since the appealed rulings were made at the summary judgment stage, we rehearse the facts in the light most favorable to the nonmovants (here, the plaintiffs), consistent with record support.  <u>See</u> <u>DePoutot</u> v. <u>Raffaelly</u>, 424 F.3d 112, 114 (1st Cir. 2005).

- 3 -

On the evening of August 16, 2009, a concerned citizen called the Sturbridge, Massachusetts police department to report a ruckus in his backyard.  When officers arrived at the caller's home, they encountered two young men who complained that someone had been hiding in the woods and throwing various objects (such as rocks and bottles) at them.  The object-thrower also hurled racial epithets and told the men that he would murder them and their families in their sleep.

The victims tentatively identified the object-thrower as their down-the-street neighbor, Charles Morse, and warned that he might be armed.  Morse was a known quantity to the police: he had been charged several years earlier after threatening one of his daughter's suitors with a gun.

Having secured the victims' reports, the officers began to hunt for Morse.  They first checked the woods but came up empty-handed.  Next, they went to his home, where his wife, Lesa, said that Morse was out with a friend.  The officers asked her to notify them when he returned.

The officers continued their search.  By now, their team included five local officers and two state troopers (with at least one dog).  Roughly an hour after first responding to the scene, the entire contingent (except for one Sturbridge officer, who lingered to watch over the young men) doubled back to Morse's home.

- 4 -

Two officers approached the front door while four officers circled to the rear.

This time, Morse was home.  When he opened the interior back door, he locked the screen door that separated him from his visitors.  He asked the officers why they were there, but they furnished no details.  Instead, they asked Morse to step outside to answer some questions.  When Morse refused, one of the officers told him that he was under arrest.  Morse replied that the officers ought to return with a warrant, and he promptly shut the interior door.

The officers did not leave.  Instead, they ordered Morse to open the door and warned him that they would enter forcibly if he did not obey.  Morse stood fast, so the officers kicked through both the screen door and the wooden interior door to gain entry.  Five officers entered with their guns drawn and proceeded to arrest Morse.

Morse's wife took umbrage at the officers' invasion of her home.  As the officers effected the arrest of her husband, she answered a call from a concerned neighbor.  When she informed the caller that armed policemen had just arrested her husband, she was ordered to hang up the telephone.  She refused to do so, and an officer handcuffed her while others performed a protective sweep.

Several minutes later, the officers released Lesa and transported Morse to the station.  They charged him with a litany

of offenses, including assault and battery with a dangerous weapon, threatening to commit murder, disorderly conduct, and disturbing the peace. All of the charges were later dropped.

We fast-forward to late 2012, when the Morses sued the officers in a Massachusetts state court. The defendants removed the action to the federal district court. See 28 U.S.C. §§ 1331, 1441. In their complaint — which invoked 42 U.S.C. § 1983[1] — the plaintiffs claimed, as relevant here, that the defendants' warrantless entry and the subsequent arrest violated their Fourth Amendment rights to be free from unreasonable searches and seizures. They also claimed that the defendants transgressed the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, §§ 11H, 11I, and intentionally inflicted emotional distress (a tort under state law).[2]

Following pretrial discovery and some preliminary skirmishing, the defendants moved for summary judgment on, inter alia, qualified immunity grounds. See Fed. R. Civ. P. 56(a). Three separate motions were filed: one on behalf of the five

---

[1] As a general matter, section 1983 supplies a cause of action against any person who, while acting under color of state law, violates another person's constitutional rights. See Kalina v. Fletcher, 522 U.S. 118, 123 (1997).

[2] The plaintiffs' complaint included claims of excessive force as well. The district court found that the defendants were entitled to qualified immunity with respect to those claims, Morse, 123 F. Supp. 3d at 194, and that ruling is not at issue in this proceeding.

Sturbridge police officers and one on behalf of each state trooper.[3]

In their motion papers, the defendants insisted that exigent circumstances justified their warrantless entry and, in any event, what transpired amounted to a doorway arrest. Moreover, they sought summary judgment on all of the plaintiffs' other claims.

The district court granted the defendants' motions in part and denied them in part. See Morse, 123 F. Supp. 3d at 196. The court ruled that, on the summary judgment record, the plaintiffs had made a sufficient showing that their constitutional rights were violated. See id. at 188-89. In handing down this ruling, the court concluded that the defendants had probable cause to arrest Morse. It went on to hold, though, that a reasonable juror could find that the circumstances were not sufficiently exigent to allow a warrantless invasion of the plaintiff's home and Morse's ensuing arrest. See id. at 187-89. Because a genuine issue of material fact remained, the court refused to grant either summary judgment or, by implication, qualified immunity based on exigent circumstances. See id. at 189.

In explaining this ruling, the court noted that a full hour had passed between the officers' awareness of the contretemps

---

[3] For present purposes, it is unnecessary to distinguish among these officers.

involving the young men and their encounter with Morse at his home. See id. at 187. Relatedly, the court highlighted deposition testimony from one of the defendants to the effect that he and his fellow officers were not anticipating any sort of emergency situation when they knocked on the plaintiffs' door, nor were they engaged in a hot pursuit of Morse at that time. See id. Finally, the court stressed that none of the officers had expressed any concern that Morse might escape through the front door, destroy evidence, or hurt someone inside the home.[4] See id. at 188.

At the same time, the court rejected the defendants' claim that a doorway arrest had occurred. See id. at 192. In the court's view, the circumstances of Morse's arrest — including the fact that he was behind a locked door for the entire time — distinguished his case from the doorway-arrest cases cited by the defendants. The court held that Morse's case fit comfortably within the scope of clearly established law. See id. Summing up, the court stated: "[v]iewing the facts from the record in the light most favorable to the Plaintiffs, no reasonable law enforcement officer would have understood the warrantless entry and arrest of Charles Morse to comport with the Fourth Amendment." Id. This

---

[4] Importantly, the defendants gave no indication that Lesa seemed to be endangered by her husband or that she felt threatened by him. To the contrary, the record makes manifest that she sided with Morse and began yelling at the officers when they broke into her home.

finding, of course, effectively derailed the defendants' quest for qualified immunity.[5]  See id.  The court further determined that genuine issues of material fact prevented the granting of summary judgment on the plaintiffs' MCRA and state tort claims.  See id. at 195-96.

State trooper Sean Maher and four local officers (Sergeant Michael Cloutier and officers Larry Bateman, David Fortier, and Ronald Obuchowski, Jr.) separately appeal the court's denial of their motions for summary judgment on the warrantless entry and arrest claims, the MCRA claims, and the state tort claims.  The appeals have been consolidated in this venue.

## II. ANALYSIS

Summary judgment is appropriate only when the record, read in the light most favorable to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56(a); Schiffmann v. United States, 811 F.3d 519, 524 (1st Cir. 2016).  We review de novo orders granting or denying summary judgment.  See DePoutot, 424 F.3d at 117.  Interlocutory orders denying summary judgment — like most interlocutory orders — are,

---

[5] Two of the officers — Sturbridge police sergeant Jeffrey LaVallee and Massachusetts state trooper Brian Frechette — never entered Morse's home and did not participate in his arrest.  The district court entered summary judgment in their favor, see Morse, 123 F. Supp. 3d at 196, and that ruling is not before us.

for the most part, not immediately appealable.  See Valdizán v.
Rivera-Hernandez, 445 F.3d 63, 64 (1st Cir. 2006).  But where, as
here, a denial of summary judgment implicates a claim of qualified
immunity, "the dividing line between appealable and non-appealable
denials of summary judgment is blurred."  Camilo-Robles v. Hoyos,
151 F.3d 1, 8 (1st Cir. 1998).

     To plot this line in a given case, a reviewing court
must first consider whether the district court's summary
judgment/qualified immunity determination was legal or factual in
nature.  See id.  Purely legal rulings implicating qualified
immunity are normally reviewable on an interlocutory appeal;
determinations of evidentiary sufficiency are not.  See Johnson v.
Jones, 515 U.S. 304, 319-20 (1995).  In applying these principles,
the devil is in the details.  Generally, a claim that a certain
body of facts makes out a violation of clearly established law is
deemed to present a question of law and, thus, is reviewable.  See
Camilo-Robles, 151 F.3d at 8.  However, when the trial court's
summary judgment/qualified immunity decision "turns on either an
issue of fact or an issue perceived by the trial court to be an
issue of fact," the decision presents a question of fact and, thus,
is nonreviewable.  Stella v. Kelley, 63 F.3d 71, 74 (1st Cir.
1995).

     Qualified immunity is a prophylactic doctrine.  The
doctrine shields government officials "from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In practice, the doctrine affords government officials a "margin of error" to make reasonable mistakes in the course of their work. Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009). When properly applied, "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" White v. Pauly, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam)).

The qualified immunity analysis "entails a two-step pavane." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017). At the first step, a reviewing court must evaluate "whether the plaintiff's version of the facts makes out a violation of a protected right." Id. At the second step, the court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. (quoting Matalon v. Hynnes, 806 F.3d 627, 633 (1st Cir. 2015)).

The second step of this inquiry is itself divisible into two sub-parts. First, the plaintiff must identify either "controlling authority" or a "consensus of cases of persuasive authority" sufficient to signal to a reasonable officer that particular conduct would violate a constitutional right. Wilson v. Layne, 526 U.S. 603, 617 (1999). This inquiry "must be

undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). The aim is to ensure that the state of the law is sufficiently specific to give fair and clear warning to government officials. See United States v. Lanier, 520 U.S. 259, 270-71 (1997). The second sub-part asks whether a reasonable officer in the defendant's position would have known that his conduct violated the established rule. See Wilson v. City of Boston, 421 F.3d 45, 57-58 (1st Cir. 2005).

The Fourth Amendment furnishes the legal backdrop here. It declares that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. Ultimately, though, "the home is first among equals," Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013), and is "shielded by the highest level of Fourth Amendment protection," Matalon, 806 F.3d at 633. Accordingly, "the Fourth Amendment has drawn a firm line at the entrance to the house" and warrantless entries into a home "are presumptively unreasonable." Payton, 445 U.S. at 586, 590.

Notwithstanding this bedrock rule of constitutional law, the defendants maintain that they cannot be held civilly liable for their encounter with Morse and, thus, that the plaintiffs have not satisfied the first step of the qualified immunity paradigm.

They proffer two independent (though related) lines of defense, which we address sequentially.

## A. **Exigent Circumstances.**

Arresting a suspect inside his home without a warrant violates the Fourth Amendment unless some "well-delineated exception[]" shields the intrusion.  United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004).  Exigent circumstances constitute such an exception.  See United States v. Almonte-Báez, 857 F.3d 27, 31 (1st Cir. 2017).  This exception has a practical cast: it "reflects an understanding and appreciation of how events occur in the real world."  Id.  Given that police officers "are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving," Kentucky v. King, 563 U.S. 452, 466 (2011) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)), the exception allows warrantless entries when "there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant," Matalon, 806 F.3d at 636 (quoting Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999)).  Such circumstances may arise in connection with, for example, hot pursuit of a fleeing felon, the imminent destruction of evidence, a substantial risk of flight, or a threat to the police or public.  See Hegarty v. Somerset Cty., 53 F.3d 1367, 1374 (1st Cir. 1995).

To invoke the exigent circumstances doctrine as a basis for a warrantless entry into a person's home for the purpose of

effecting an arrest, law enforcement officers must show not only
that they faced a sufficient exigency but also that they had
probable cause to effect the planned arrest. See Kirk v.
Louisiana, 536 U.S. 635, 638 (2002) (per curiam) (explaining that
"police officers need either a warrant or probable cause plus
exigent circumstances in order to make a lawful entry into a
home"); Almonte-Báez, 857 F.3d at 31 (similar).

        The court below found that the officers had probable
cause to arrest Morse — after all, they had first-hand reports
that he had hurled rocks and bottles at two young men who were
minding their own business and, in the bargain, had threatened
them — and that finding is not challenged on appeal.  The dispute
here concerns the existence vel non of exigent circumstances, and
the district court concluded that the record, viewed in the light
most favorable to the plaintiffs, presented genuine issues of
material fact as to that point.  See Morse, 123 F. Supp. 3d at
187-89.  The defendants attempt to challenge this conclusion in
two ways.

        1.  **Mistake of Law.**  To begin, the defendants asseverate
that the district court erroneously used a subjective standard
rather than an objective one in adjudicating the viability of their
claim of exigent circumstances.  In support, they cite a portion
of the court's rescript explaining that one officer in particular
"acknowledged that [the officers] were not in 'hot and continued

pursuit' of Morse." Id. at 187. Since this asseveration turns on a question of law, we have jurisdiction to consider it. See Johnson, 515 U.S. at 319; Camilo-Robles, 151 F.3d at 8.

The premise of the defendants' argument is correct: the exigent circumstances inquiry considers "the objective facts reasonably known to, or discoverable by, the officers at the time of the [incident]." United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995). But in marshalling those facts, a court may take into account what the officers knew when the incident occurred. See, e.g., Almonte-Báez, 857 F.3d at 33 (concluding that, "[g]iven the totality of what [federal agents] knew and what they reasonably suspected," they had reason to believe the circumstances were exigent); United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005) (similar). The bottom-line question is not — as the defendants suggest — what a reasonable officer would have known. Rather, the bottom-line question is whether a reasonable officer would have thought, given the facts known to him, that the situation he encountered presented some meaningful exigency. See Almonte-Báez, 857 F.3d at 32-33.

Here, the district court focused on what the officers actually knew and what they reasonably could have suspected when they reached Morse's doorstep. It concluded that "[a] reasonable juror could credit this evidence and find that there was no objective basis for the officers to believe that exigent

circumstances existed."  Morse, 123 F. Supp. at 188-89.  In reaching this conclusion, the court applied the proper legal standard.  See Almonte-Báez, 857 F.3d at 32.

> **2.  Existence of Genuine Issues of Material Fact.**  The defendants' second line of attack challenges the district court's determination that, on the summary judgment record, the exigent circumstances question is freighted with genuine disputes of material fact.  See Morse, 123 F. Supp. 3d at 188-89.  The plaintiffs counter that this determination is factual in nature and, therefore, that we lack jurisdiction to review it in these interlocutory appeals.  Because jurisdiction is both a legally and a logically antecedent question, see Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998), we address the plaintiffs' argument first.

A defendant asserting a qualified immunity defense may obtain interlocutory review of a denial of his motion for summary judgment, even if the district court concluded that the record presented a genuine dispute of material fact, as long as he accepts as true the plaintiff's version of the facts and argues that he is entitled to qualified immunity on that version of the facts.  See Mlodzinski v. Lewis, 648 F.3d 24, 28 (1st Cir. 2011); Díaz v. Martínez, 112 F.3d 1, 4-5 (1st Cir. 1997).

The defendants insist that, for purposes of these appeals, they have accepted the plaintiffs' version of the facts

and challenge only the application of the law to those facts.
Here, however, the defendants say one thing and do another.  The
arguments that they raise on appeal attempt to contradict, in
significant ways, the plaintiffs' version of the facts.

The defendants contend, for example, that they were
forced to "act swiftly, to make a split second decision, in order
to quell a threat of violence and the escalation of a violent
event."  They also contend that Morse posed "a serious and
immediate risk" to the young men whom he had earlier bombarded
with rocks and other objects.  But these contentions are squarely
at odds with the plaintiffs' supported version of the facts.  The
district court noted, for instance, that a full hour had passed
between the time that the defendants learned of the conflict
between Morse and the young men and the defendants' encounter with
Morse at his home.  See Morse, 123 F. Supp. 3d at 187.  By then,
the victims were nowhere near Morse and, at any rate, were under
police protection.  The court also cited deposition testimony in
which one of the officers explained that he and his colleagues
were not anticipating any sort of emergency situation when they
went to Morse's door.  See id.  In that vein, that officer
acknowledged that the police were not in hot pursuit of Morse and
had made no decision to arrest him before they knocked on his door.
See id.  Thus, there was at the very least a genuine issue of
material fact as to whether it was unreasonable under clearly

established law for an officer to believe that any exigency existed before Morse and the defendants began to converse.

Nor do any undisputed facts show a later-developing exigency. The district court accurately remarked the utter absence of any evidence that Morse might try to escape, destroy evidence, or hurt anyone inside the home. See id. at 188. Last — but far from least — the court pointed to an officer's testimony that he broke through the door "not because of immediate danger, but because Morse was not cooperating." Id. That a suspect will not agree to step outside his home in response to an officer's request does not, without more, constitute exigent circumstances sufficient to authorize a warrantless entry into the home. See United States v. Pérez-Díaz, 848 F.3d 33, 39 (1st Cir. 2017).

The short of it is that the defendants plainly rest their appeals on an alternative version of the facts, that is, a version different from that relied on by the plaintiffs. Each version has some factual support in the record and, in the last analysis, each depends on what inferences a factfinder elects to draw from among reasonable, but conflicting, alternatives. By suggesting that the district court did not choose appropriately from among these competing sets of inferences and by asking us to discount the plaintiffs' plausible rendition of the facts, the defendants are making a quintessentially factbound argument "inextricably intertwined with whatever 'purely legal' contentions" their briefs

contain.  <u>Cady</u> v. <u>Walsh</u>, 753 F.3d 348, 360 (1st Cir. 2014); <u>see</u>
<u>Diaz</u>, 112 F.3d at 5 (finding unreviewable arguments that
plaintiffs' facts "warrant a different spin, tell only a small
part of the story, and are presented out of context").  It follows
that the defendants' exigent circumstances argument entails a
prototypical factual dispute, not eligible for interlocutory
review.  <u>See Tang</u> v. <u>R.I., Dep't of Elderly Affairs</u>, 120 F.3d 325,
326 (1st Cir. 1997).  As a result, we lack jurisdiction to
entertain this aspect of the defendants' appeals and must assess
the facts relevant to the existence of an exigency in the light
most favorable to the plaintiffs.[6]  <u>See Schiffmann</u>, 811 F.3d at
524 (explaining that a court reviewing a summary judgment ruling
must "read the record in the light most hospitable to the nonmoving
parties . . . and draw all reasonable inferences in their favor").

### B.  <u>Doorway Arrests</u>.

        The defendants have another argument waiting in the
wings.  They insist that the Fourth Amendment's warrant requirement

---

        [6] We note that, in all events, the defendants' exigent
circumstances argument may run headlong into the decision in
<u>Kentucky</u> v. <u>King</u>, 563 U.S. 452 (2011).  There — in a case decided
after the incident at Morse's home occurred — the Supreme Court
observed that "[t]here is a strong argument to be made that
. . . the exigent circumstances rule should not apply where the
police, without a warrant . . . , threaten that they will enter
without permission unless admitted."  <u>Id.</u> at 462 n.4 (dictum).
The plaintiffs suggest that the defendants did just that: they
told Morse that if he did not reopen his door, they would use force
to gain admission to his home — and then they did.

does not apply because Morse's arrest was a doorway arrest,
obviating the need for a warrant.   This argument presents a
question of law and, thus, we have jurisdiction to review it.   See
Johnson, 515 U.S. at 319; Camilo-Robles, 151 F.3d at 8.

   The defendants' argument hinges on the notion that the
controlling precedent is not Payton but, rather, United States v.
Santana, 427 U.S. 38 (1976).   There, the police arrived at the
suspect's home to find her "standing directly in [her] doorway —
one step forward would have put her outside, one step backward
would have put her in the vestibule of her residence."   Id. at 40
n.1.   As soon as they approached, the suspect beat a retreat into
her home, and the police followed to complete the arrest.   See id.
at 40.

   On these facts, the Supreme Court concluded that the
police could arrest the suspect inside her home without a warrant.
See id. at 42-43.   The Court reasoned that by standing in her
doorway, the suspect had voluntarily placed herself in public view
and was, for all intents and purposes, in a public space.   See id.
at 42.   It was noteworthy, in the Court's view, that the suspect
was exposed not only to public view but also to public "speech,
hearing, and touch as if she had been standing completely outside
her house."   Id.   Crucial to the analysis was the officers' claim
that they were operating under exigent circumstances: the suspect
was not merely stepping into her home but was fleeing arrest,

Case 4:13-cv-40160-TSH Document 175 Filed 08/25/17 Page 21 of 31

requiring the officers to follow her in hot pursuit.  See Santana, 427 U.S. at 42-43; see also Welsh v. Wisconsin, 466 U.S. 740, 750 (1984) (classifying Santana as an exigent circumstances case).  In such circumstances, the Court held, a suspect cannot "defeat an arrest which has been set in motion in a public place . . . [by] escaping to a private place." Santana, 427 U.S. at 43.

The defendants argue that Santana controls here.  They maintain that "[w]hen Morse chose to open his door," he exposed himself to public view and was therefore in a public space where he could be arrested without a warrant.  They add that, like the officers in Santana, they were operating under exigent circumstances because they were in hot pursuit of their suspect.

This case, however, is at a significant remove from Santana.  For one thing, Morse came to his doorway only after the officers knocked.  Thus, he was in public view only because the police — unlike the police in Santana — summoned him to his door.  For another thing, unlike the suspect in Santana, Morse was not standing directly in his doorway.  Instead, even when he approached the doorway in response to the officers' knock, he remained behind a locked door (albeit a transparent one).  For these reasons, he was not situated "as if [he] had been standing completely outside [his] house." Id. at 42.  What is more, we cannot conclude, at this stage, that the police were engaged in a hot pursuit as in Santana.  See id.  Rather, the district court found a genuine issue

of material fact regarding the existence vel non of exigent circumstances. See Morse, 123 F. Supp. 3d at 188-89. Given the fact-based nature of the defendants' arguments on appeal, we lack jurisdiction to question that finding in this case. See supra Part II(A). Thus, we must assume that the defendants faced no exigency. See Díaz, 112 F.3d at 4-5.

Given these important distinctions, we reject the defendants' attempt to bring this case under Santana's protective carapace. Accepting the defendants' expansive reading of Santana would permit police officers to enter a suspect's home to arrest him without a warrant as long as the suspect was visible to someone on the other side of his door. The Payton Court has emphasized that "the Fourth Amendment has drawn a firm line at the entrance to the house," Payton, 445 U.S. at 590, and that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," id. at 585 (quoting United States v. U.S. Dist. Ct., 407 U.S. 297, 313 (1972)). The defendants' reading of Santana would turn that firm line into a dotted line and, at the same time, would unfairly punish any suspect who chooses to come to the door upon hearing a police officer's knock. Cf. King, 563 U.S. at 469-70 (explaining that, as a general matter, "[w]hen law enforcement officers who are not armed with a warrant knock on a door, . . . the occupant has no obligation to open the

door or to speak"). Consequently, Santana does not control this case.

This brings us to a pivotal point in our analysis. Given the two determinations we have thus far reached — that the district court's exigent circumstances assessment is unreviewable at this juncture and that Morse (unlike the suspect in Santana) was not in a public place at the critical time — we hold that the facts, taken in the light most favorable to the plaintiffs, make out a violation of a constitutional right. See Alfano, 847 F.3d at 75. Accordingly, we proceed to the next step of the qualified immunity paradigm and consider whether the applicable law was so clearly established that no reasonable officer would have entered the plaintiffs' home without a warrant. See id.

Not surprisingly, the defendants argue that the applicable law was not clearly established. In support, they submit that our analysis should mirror that in Joyce v. Town of Tewksbury, 112 F.3d 19 (1st Cir. 1997) (en banc) (per curiam), resulting in a grant of qualified immunity. In Joyce, police officers, acting on a tip, arrived at the home of Joanne and James Joyce to arrest their son, Lance (who did not live there). See id. at 20. When the officers knocked, Lance opened the interior door but kept the outer screen door closed (though apparently unlocked). See id. An officer told Lance that the police had a warrant for his arrest on a domestic violence-related charge, to

- 23 -

which Lance replied "ya right." Id.  As Lance moved back into the
dwelling, the officers followed him inside and effected the arrest.
See id. at 20-21.

Lance's mother subsequently sued, arguing that the
officers had violated her Fourth Amendment rights when they entered
her home without a search warrant.  See id. at 21-22.  In support,
she cited Steagald v. United States, in which the Supreme Court
held that law enforcement officers need both a search warrant and
an arrest warrant to arrest a suspect in a third party's home.
451 U.S. 204, 216 (1981).  Because the officers who entered her
home lacked a search warrant, her thesis ran, they abridged her
Fourth Amendment rights.  In opposition, the defendants relied on
Santana and argued that they had not violated the Fourth Amendment
because they had a warrant for Lance's arrest, he had been standing
in the doorway when they first sought to arrest him, and they
followed him into the home in hot pursuit.  See Joyce, 112 F.3d at
21.

The en banc decision in Joyce revealed a sharply divided
court and produced no fewer than four opinions.  The lead opinion
concluded that the cases upon which the parties relied — "with
Steagald at one pole and Santana at the other" — did "not
definitively resolve" their dispute.  Id. at 22.  In the end, the
majority did not decide whether the officers' entry was unlawful
but, rather, held that the officers were entitled to qualified

immunity because Lance's arrest was a true doorway arrest and "there is no settled answer as to the constitutionality" of such an arrest.  Id.  Two of the six judges were in dissent, positing "that the officers' entry into a third party's home in the absence of consent, a search warrant, or exigent circumstances plainly violated Steagald and thus violated the homeowner's clearly established Fourth Amendment rights."  Id. at 26 (Selya, J., dissenting).

      The Joyce majority refrained from any endorsement of the constitutionality of the officers' conduct.  Even so, Joyce remains useful to the present defendants because the Joyce majority concluded that the law was not clearly established in 1989 (when the events in Joyce transpired).  But the utility of that conclusion is quite limited: Fourth Amendment jurisprudence has evolved in the decades that have passed between the encounter in Joyce and the 2009 encounter at the Morse's home.  In the intervening years, the Supreme Court reiterated, time and time again, the Payton Court's admonition that, in the absence of some recognized basis for ruling otherwise (such as consent, a warrant, or exigent circumstances), "the Fourth Amendment has drawn a firm line at the entrance to the house." Payton, 445 U.S. at 590; see, e.g., Groh v. Ramirez, 540 U.S. 551, 564 (2004) (holding that "[n]o reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency,

a warrantless search of the home is presumptively unconstitutional"); Kirk, 536 U.S. at 635-36 (explaining that state court "plainly violate[d]" Payton rule when it failed to evaluate exigent circumstances but still held that officers' warrantless entry, arrest, and search of suspect's home did not offend Fourth Amendment); Kyllo v. United States, 533 U.S. 27, 40 (2001) (declaring that Payton's line at the entrance to a home "must be not only firm but also bright"); Minnesota v. Carter, 525 U.S. 83, 100 (1998) (stating that "[i]t is now settled . . . that for a routine felony arrest and absent exigent circumstances, the police must obtain a warrant before entering a home to arrest the homeowner").

This court, too, has — subsequent to Joyce — strongly reinforced the significance of Payton's protections of the home. See, e.g., DeMayo v. Nugent, 517 F.3d 11, 18 (1st Cir. 2008) (holding that, by 2004, "the 'firm line' drawn by Kirk and Payton provided [police officers] with sufficient notice that their entry into [plaintiff's] home was in violation of clearly established law"); Burke v. Town of Walpole, 405 F.3d 66, 77 (1st Cir. 2005) (describing Payton's protections as "indelibly etched in jurisprudential granite" (quoting Buenrostro v. Collazo, 973 F.2d 39, 43 (1st Cir. 1992))). Payton and its progeny clarify a matter of Fourth Amendment law that Joyce, which relied on the "clearly established" prong of the qualified immunity paradigm, left

unaddressed: namely, the doorway arrest exception recognized in
Santana does not apply in a case in which a door was never opened,
the person behind the door (screen door though it was) was first
observed by law enforcement while he was behind that door, and no
exigent circumstances existed.

Of greater relevance here, this steadily growing
stockpile of precedent makes pellucid that Payton, by 2009,
constituted both a firm line and a bright line. Put simply, it
constituted clearly established law. That clearly established law
was sufficient to give reasonable police officers fair and clear
warning that using force to enter the plaintiffs' home to
effectuate Morse's arrest — without either a warrant or a
reasonable basis for believing that exigent circumstances existed
— would violate his Fourth Amendment rights.

The fact that the Supreme Court has not yet considered
the precise factual scenario that the defendants faced does not
demand a different conclusion. After all, the Court has recognized
that "general statements of the law are not inherently incapable
of giving fair and clear warning." Lanier, 520 U.S. at 271. The
Court added that "a general constitutional rule already identified
in the decisional law may apply with obvious clarity to the
specific conduct in question." Id. This is such a case.

In all events, this case differs in material respects
from Joyce. At the very least, those distinctions should have

signaled to reasonable officers that their conduct did not fall within the same zone of uncertainty identified in Joyce.

First and foremost, the Joyce court seized upon the notion that the officers were in hot pursuit of Lance when they entered his parents' home. See Joyce, 112 F.3d at 22. As a result, Santana's reliance on the existence of exigent circumstances played a significant role in the court's analysis. See id. For the reasons discussed above, however, we cannot credit at this juncture the defendants' assertions that they too were operating under exigent circumstances. On the plaintiffs' supported version of the facts, which we must accept as true in reviewing a summary judgment ruling, see Schiffmann, 811 F.3d at 524, the defendants were not in hot (or even lukewarm) pursuit when they entered the plaintiffs' home.[7]

In addition, the defendants — unlike the officers in Joyce — did not have an arrest warrant in hand. The fact that the district court later found that the officers had probable cause is no substitute. The Supreme Court "has insisted that inferences of

---

[7] We add, moreover, that the entry in Joyce was not effected through the use of force; rather, the police merely opened an apparently unlocked screen door and followed the suspect into his parents' dining room. See Joyce, 112 F.3d at 20. Here, in contrast, after Morse told the defendants to return with a warrant and closed the interior door, the defendants forcibly broke through not one, but two, locked doors in order to arrest him. This course of conduct rendered the defendants' entry into the plaintiffs' home much more intrusive — and, therefore, even less reasonable — than the entry in Joyce. See Morse, 123 F. Supp. 3d at 191.

probable cause be drawn by 'a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" Shadwick v. City of Tampa, 407 U.S. 345, 350 (1972) (quoting Johnson v. United States, 333 U.S. 10, 14 (1948)).

Last but not least, Morse (unlike the suspect in Joyce) was seized in his own home. Thus, his case — in contrast to Joyce — implicates both his privacy right to bar warrantless entry into his own home and his right to be free from warrantless seizures inside that home. Cf. Silverman v. United States, 365 U.S. 505, 511 (1961) (observing that "the right of a man to retreat into his own home and there be free from unreasonable government intrusion" stands at the Fourth Amendment's "very core").

The short of it is that the situation that existed when Morse closed the interior door to his home was such that a reasonable police officer, in the absence of exigent circumstances, should have realized that forcibly breaking into the house without any sort of warrant would offend Morse's Fourth Amendment right to be free from an unreasonable seizure inside his own home. Merely because arrests near doorways may present close calls in some cases does not mean that they present close calls in all cases. Here, the defendants invite us, in effect, to cheapen the currency of Payton and its progeny and to award them qualified immunity. In the circumstances of this case, honoring their

- 29 -

request would require us to "disregard the overriding respect for
the sanctity of the home that has been embedded in our traditions
since the origins of the Republic." <u>Payton</u>, 445 U.S. at 601.   We
thus decline the defendants' invitation.   Morse was subjected to
a warrantless arrest inside his home, and we agree with the
district court that, on this scumbled record, the officers involved
in that arrest are not entitled to qualified immunity at the
summary judgment stage.

### C.   <u>State Law Claims</u>.

Finally, the defendants appeal from the district court's
refusal to dismiss the plaintiffs' state law claims, including
their MCRA claims and their claims for infliction of emotional
distress.   But the defendants moved for summary judgment on the
merits of those claims, and the district court denied their motions
on merits-related grounds.   <u>See</u> <u>Morse</u>, 123 F. Supp. 3d at 195-96.
It is settled beyond peradventure that we lack jurisdiction to
hear appeals from the routine denial of summary judgment motions
on the merits.   <u>See</u>, <u>e.g.</u>, <u>Valdizán</u>, 445 F.3d at 64; <u>Camilo-Robles</u>
v. <u>Zapata</u>, 175 F.3d 41, 44-45 (1st Cir. 1999).   Nor does the fact
that the defendants couple their appeals with appeals from
interlocutory orders denying qualified immunity cure this
jurisdictional defect.   <u>See</u> <u>Johnson</u>, 515 U.S. at 319-20; <u>Camilo-
Robles</u>, 151 F.3d at 8.   Accordingly, we dismiss these aspects of
the defendants' appeals for want of appellate jurisdiction.

## III.  CONCLUSION

We need go no further.  Although the defendants ask us to reverse the denial of summary judgment on the merits of certain state-law claims, we lack jurisdiction to consider such an issue on interlocutory review.  As to the defendants' claims of qualified immunity, we <u>dismiss</u> the appeal in part for want of appellate jurisdiction and otherwise <u>affirm</u> the district court's denial of summary judgment based on qualified immunity.

**<u>So ordered</u>.**